SWANGO HOMES, INC., Plaintiff,

v.

COLUMBIA GAS TRANSMISSION CORPORATION, Defendant and Third–Party Plaintiff,

v.

William MORAVEK, et al., Third–Party Defendants.

No. C–3–91–335.

United States District Court, S.D. Ohio, W.D.

July 21, 1992.

Barry Wayne Mancz, Jeffrey, Snell, Rogers & Green, Dayton, Ohio, for plaintiff and third-party defendants.

Gregory Paul Dunsky, Bieser, Greer & Landis, Dayton, Ohio, Harry C. Bruner, Jr., Charleston, W.Va., for defendant and third-party plaintiff.

FINDINGS OF FACT AND CONCLUSIONS OF LAW; OPINION; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND THIRD–PARTY PLAINTIFF AND AGAINST PLAINTIFF AND THIRD–PARTY DEFENDANTS; THIRD PARTY DEFENDANTS ENJOINED FROM MAINTAINING STORAGE SHED, OR ANY SIMILAR STRUCTURE, WITHIN SUBJECT EASEMENT; STORAGE SHED TO BE REMOVED BY DATE CERTAIN; TERMINATION ENTRY

RICE, District Judge.

This declaratory judgment action was originally filed by Plaintiff Swango Homes,

Inc. (Swango or Swango Homes), in the Montgomery County Common Pleas Court. Defendant Columbia Gas Transmission Corporation (Columbia) removed the action to this Court (Doc. # 1) and filed a Third–Party Complaint (Doc. # 3) against Third–Party Defendants William and Vernetta Moravek. At issue in this matter are the rights of the parties with respect to an easement or right-of-way in favor of Columbia which encumbers property owned by Swango and the Moraveks. The captioned cause was tried before the Court on June 26, 1992. The parties have filed post-trial submissions in the nature of suggested findings of fact and conclusions of law, together with written closing arguments (*See* Docs. 17–21). Based upon the evidence presented at said trial on the merits, as illuminated by the post-trial submissions of counsel, this Court hereby makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff Swango Homes, Inc., is an Ohio corporation with its principal place of business in Ohio. Swango is in the business of constructing and selling residential homes.

2. Defendant and Third–Party Plaintiff Columbia Gas Transmission Company is a Delaware corporation with its principal place of business in West Virginia. Columbia is in the business of transmitting natural gas through underground transmission lines.

3. Third–Party Defendants William and Vernetta Moravek are citizens of the state of Ohio.

4. Swango has been involved in the development of a residential subdivision known as Cobblestone Crossing, located in Washington Township, Montgomery County, Ohio. The real property upon which the subdivision is situated is owned by Swango.

5. A number of the lots in Cobblestone Crossing are encumbered by a permanent easement or right-of-way granted to the Ohio Fuel Gas Company by Everett A. and Maretta Savage on December 30, 1968.

6. The easement extends along the back property line of a number of lots and is twenty feet in width. The easement conveys to the Ohio Fuel and Gas Company the right to "lay a pipe line over and through the [easement], and to maintain, operate without restriction or limitation, repair, replace and remove same."

7. The easement in question is now the property of Columbia, the Ohio Fuel and Gas Company's successor in interest.

8. Swango Homes is aware of and recognizes Columbia's easement. The "dedication" portion of the Cobblestone Crossing record plan states, *inter alia:*

> Easements shown on the within plat are for the construction, operation, maintenance, repair, replacement or removal of water, sewer, gas, electric, telephone, or other utility lines or services and for the express privilege of removing any or all trees or other obstructions for the free use of said utilities and for providing ingress to and egress from the premises for said purpose and are to be maintained as such forever.

9. All lots in Cobblestone Crossing are subject to the following protective covenant:

> 15. Easements affecting lots shown on the record plan are reserved for utility installation, maintenance and surface water drainage. Any improvements made on any easement by the property owner are made [at] the risk of the property owner.

10. The easement runs through lots designated on the record plan as Lots 3–10. The Moraveks purchased Lot 10 from Swango, subject to the aforementioned restrictive covenants.

11. Swango has also sold Lot 8, and Lot 3 is contracted for sale. Swango continues to own Lots 4–7 and Lot 9, which it estimates have an average value of $38,000 per lot.

12. Columbia owns and operates a Class 3 natural gas transmission line known as A–150. Transmission Line A–150 runs underground through the subject easement.

13. Transmission Line A–150 provides natural gas to the Dayton Power & Light Company for its Dayton, Centerville, Miamisburg and Bellbrook markets.

14. Transmission Line A–150 transports over 180 million cubic feet of natural gas per day, resulting in daily revenue in excess of $66,000.

15. Columbia's operation of Transmission Line A–150 is governed by the Natural Gas Pipeline Safety Act, 49 U.S.C. App. § 1671 *et seq.*, and the regulations promulgated thereunder, which set minimum federal safety standards for the design, installation, inspection, emergency plans and procedures, testing, extension, construction, operation, replacement and maintenance of pipeline facilities. .

16. Under the pertinent regulations, 49 C.F.R. § 192, Columbia is required to perform five types of inspections with respect to Transmission Line A–150: close interval surveys, potential surveys, leakage surveys, car patrol surveys and aerial surveys.

17. A close interval survey, which tests the pipeline for external corrosion, is carried out by checking the pipeline at approximately two-foot intervals with a computerized instrument. In order to perform this test properly, the survey must be taken from a point directly over the pipeline.

18. Columbia is required to perform a close interval survey on an annual basis, with a maximum of fifteen months between tests. .

19. Potential surveys, which must be performed on an annual basis, require Columbia to set up test stations at various locations along the pipeline.

20. Leakage surveys are conducted four times a year by Columbia employees who walk along the length of the pipeline checking for signs of gas leakage. One of the four annual surveys must be an "instrumented" survey; that is, the person walking the length of pipeline carries an instrument designed to detect leaking gas.

21. Columbia is required to have a program of car patrol surveys whereby Columbia employees drive the length of the pipeline checking for encroachments of the easement.

22. Similarly, Columbia conducts monthly aerial surveys to ensure that the easement remains unimpeded.

23. If one of these surveys uncovers an anomaly or leak in the pipeline, Columbia must follow up with "side drain" testing, excavation and appropriate repairs.

24. On October 9, 1990, Mark Clark, a Columbia transmission mechanic, while performing a routine car patrol, noticed that a storage shed had been erected along the back property line of Lot 10, the Moraveks' property.

25. The shed is approximately twelve feet long, ten and a half feet wide and ten feet high. The frame is constructed out of two-by-four lumber, with the walls and floor made of particle board. The entire storage shed rests on concrete blocks. The shed was built on site.

26. Swango and the Moraveks refer to the storage shed as a "temporary" structure.

27. The shed is located within the easement, with part of the shed directly over the pipeline.

28. The storage shed typically contains a riding lawnmower, fuel for the lawnmower, several bicycles, assorted garden tools and boxes containing various items.

29. Kimball Birdseye, Swango's Vice President, testified that the shed could be moved intact through the use of a rail system, which he could construct, if he had the proper materials, in about an hour. Once the rail system was constructed, the shed could be moved off the right-of-way with a backhoe, a process which would take an additional hour.[1]

30. Dana Debaets, an engineer and currently an area superintendent for Columbia, testified that, having inspected the storage shed, he did not believe it could be moved without destroying it, since it was

---

1. Birdseye admitted that this process would involve moving the shed into the drainage swale, an area normally wetter and softer than the rest of the yard.

not strong enough to withstand pushing or pulling of that nature.

31. Regardless of whether Birdseye's rail system is feasible, the storage shed is temporary in name only. It is movable, if at all, only by a complex procedure lasting at least two hours and requiring various materials which may well not be readily available.

32. When he discovered the storage shed within the easement, Clark went to the Moravek's residence and informed Vernetta Moravek that the shed would have to be moved. Vernetta Moravek told Clark that she would have to talk it over with her husband.

33. The Moraveks informed Birdseye of the problem. Birdseye contacted Clark and indicated that the Moraveks were willing to move the shed, but said that they were waiting until the weather was drier and the ground harder.

34. Clark contacted Birdseye in April, 1991, and told him that the ground was dry and that the shed should be moved. Birdseye said he would talk to the Moraveks.

35. When he found the shed in same location in June, 1991, Clark prepared a report for his supervisor.

36. When Columbia subsequently contacted Birdseye again, Birdseye informed Columbia that the Moraveks were willing to move the shed to a position not directly over the pipeline but still within the easement. Swango and the Moraveks take the position that this use is consistent with the easement.

37. Swango is concerned that the property value of its remaining lots subject to the easement will decrease if potential buyers learn that structures similar to the Moraveks' shed may not be placed within the right-of-way. However, Birdseye could not quantify the potential diminution in value.

38. The shed does not presently interfere with Columbia's potential surveys, car patrol surveys or aerial surveys.

39. In its present location, the storage shed prevents Columbia from doing a complete leakage survey, since the shed obstructs the view of the ground above the pipeline. A gas leak which developed under the shed could go undetected, possibly resulting in an accumulation of gas within the shed, presenting a risk of fire or explosion.

40. If the shed were moved from directly above the pipeline but remained within the right-of-way, Columbia would be able to perform a complete leakage survey.

41. Similarly, a close interval survey cannot be conducted with the shed in its current location, although it could be performed if the shed were within the easement but not directly above the pipeline.

42. Should an anomaly be discovered in the pipeline, Columbia would need the entire easement area to perform the required side drain, excavation and repairs. The shed would have to be moved off the easement, regardless of whether it was located directly above the pipeline.

43. The presence of the shed within the easement also interferes with Columbia's ability to formulate an emergency plan to minimize the risk of injury in the event of a gas leak or other mishap. An emergency plan is mandated by 49 C.F.R. § 192.615.

44. It would cost Columbia a minimum of $100,000 to move the pipeline to a new location.

## OPINION

■ As an initial matter, this Court must determine whether it has jurisdiction over the subject matter of this dispute. Swango and the Moraveks argue that this controversy may be settled only in state court, while Columbia contends that this Court has both diversity jurisdiction and federal question jurisdiction. Since this Court finds that it has subject matter jurisdiction based on the parties' diversity of citizenship, there is no need to decide whether this Court has jurisdiction under the Natural Gas Pipeline Safety Act, 49 U.S.C. App. § 1671 *et seq.*

28 U.S.C. § 1332(a) confers original jurisdiction upon district courts in "all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between

... citizens of different States." In this case, diversity of citizenship exists, since Swango and the Moraveks are citizens of Ohio, while Columbia is a citizen of its state of incorporation, Delaware, and the state where it maintains its principal place of business, West Virginia.

Neither Swango's Complaint nor Columbia's Third-Party Complaint sets forth legal damages; Swango requests a declaration regarding the interpretation of the easement, while Columbia seeks an order enjoining the Moraveks from maintaining the shed within the easement. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977).

From Columbia's perspective, the object of this litigation is to protect its right to have the easement free from encroachment in order to be able to comply with federal regulations. In order to continue to operate Transmission Line A–150, Columbia *must* comply with the Natural Gas Pipeline Safety Act, the provisions of which are mandatory. If structures such as the Moraveks' storage shed are erected within the easement, Columbia cannot legally operate the pipeline. Therefore, Columbia's only options would be to shut down or to move the pipeline. Shutting down the pipeline would cost Columbia $66,000 per day in revenue, while moving it would cost in excess of $100,000. In either event, the amount in controversy exceeds $50,000.

Swango's interest in this litigation is to obtain a declaration that structures such as the Moraveks' shed may be placed within the easement. Swango feels that such a declaration is necessary in order to maintain the value of its property. Swango owns seven lots subject to the easement

with an average value of $38,000 per lot, for a total value of $266,000. That estimate, of course, is based upon the encumbrance to the property as defined by Swango. Although Birdseye did not attempt to quantify the potential diminution in value of those lots, he did testify that the property value would decrease if Columbia's interpretation of the easement prevails. Given the present estimated value of the property and the substantially greater burden on the property which would be imposed under Columbia's reading of the easement, this Court concludes that Columbia has demonstrated by a preponderance of the evidence that amount in controversy exceeds $50,000.

■ Under either measurement of the value of the object of this litigation set forth above, the amount in controversy in this case exceeds the sum of $50,000. Therefore, this Court finds that it has jurisdiction over the subject matter of this dispute and may proceed to the merits of this case.[2]

■ The parties agree that the law of Ohio furnishes the rule of law with respect to the interpretation of the easement. In Ohio,

> [t]he process which creates an easement also fixes its extent. The extent and limitations of an easement created by express grant are to be ascertained from the language of the grant and the circumstances surrounding the transaction. The unrestricted grant of an easement gives the grantee all such rights as are necessary to the reasonable and proper enjoyment thereof. An easement implies necessarily a fee in another, and hence it is a right by reason of such ownership to use the land for a special purpose, and one not inconsistent with the general property in the land of the owner of the fee. By the same token, the owner of the land which is subject to an easement

---

**2.** Although this Court does not reach the issue of federal question jurisdiction, a compelling argument may be made that such jurisdiction exists in this case. The Natural Gas Pipeline Safety Act completely preempts the field of pipeline safety. *National Fuel Gas Supply Corp. v. Public Serv. Comm'n,* 894 F.2d 571 (2d Cir.

1990); *ANR Pipeline Co. v. Iowa State Commerce Comm'n,* 828 F.2d 465 (8th Cir.1987). Common law rules of property inconsistent with the congressional scheme set forth in the Act, therefore, must give way, rendering any property use inconsistent with the Act subject to injunction by this federal Court.

has the right to use the land in any manner not inconsistent with the easement, and this is true whether the easement is created by grant or by reservation. Not even the owner of the fee has a right to interfere with the proper enjoyment of the easement or to grant to another rights which infringe upon it. 36 *Ohio Jur.3d*, Easements and Licenses § 53 (1982) (footnotes omitted). The question thus becomes whether the use which Swango and the Moraveks propose, the placement of a storage shed within the confines of the easement, interferes with Columbia's reasonable and proper enjoyment of the easement.

■ The terms of the easement state that the holder of the dominant tenement (*i.e.,* Columbia) may "maintain, operate without restriction or limitation, repair, replace and remove" its transmission line. It is axiomatic that in order to maintain and operate Transmission Line A–150, Columbia must comply with the Natural Gas Pipeline Safety Act. This is so, since the Natural Gas Pipeline Safety Act completely preempts the field of pipeline safety. *National Fuel Gas Supply Corp. v. Public Serv. Comm'n,* 894 F.2d 571 (2d Cir.1990); *ANR Pipeline Co. v. Iowa State Commerce Comm'n,* 828 F.2d 465 (8th Cir. 1987). The provisions of the Act, and of the regulations promulgated thereunder, are mandatory, and a natural gas pipeline may be legally operated *only* if the express terms of the Act have been met. Accordingly, an easement which grants the right to operate a natural gas pipeline must, if the easement is not to be wholly illusory, imply the right to operate the pipeline in accordance with applicable federal laws and regulations. *See Natural Gas Pipeline Co. v. Cox,* 490 F.Supp. 452, 454 (E.D.Ark.1980).

In this case, the storage shed prevents Columbia from complying with the Act. Swango and the Moraveks concede that, with the shed in its present location, Columbia cannot perform the mandated close interval surveys and leakage surveys. Even if the shed were moved to a position not directly above the pipeline but still within the right-of-way, Columbia would not be able to take the necessary steps (side drain testing, excavation, repairs) in the event that an anomaly is discovered.

Moreover, federal regulations require that Columbia establish and maintain a plan for minimizing the hazard resulting from a gas pipeline emergency. 49 C.F.R. § 192.615. Despite the fact that Swango and the Moraveks characterize the shed in question as "temporary," the evidence unequivocally indicates that moving the shed would require substantially more than minimal effort. In the event of a gas leak or other emergency, it would be imperative for Columbia to act quickly to prevent injury to persons or property. To allow structures of this type to be placed within the right-of-way would make it nearly impossible for Columbia to establish a practical emergency plan, since Columbia would be required, in effect, to create a separate plan for each lot, depending on the type of structure the lot owner or resident had erected.

■ Ohio law recognizes the right of a utility company to remove obstructions which unreasonably or unlawfully interfere with the company's easement. In *Rueckel v. Texas E. Transmission Corp.,* 3 Ohio App.3d 153, 3 OBR 172, 444 N.E.2d 77 (1981), the court held that the growing of pine trees within a right-of-way reserved for the operation of a pipeline constituted an unreasonable interference with the easement, and that the holders of the easement were entitled to remove the obstruction. The court further enjoined the property owners from preventing the removal of the trees or from planting trees in the easement in the future. Similarly, in *Ohio Edison Co. v. Rottman,* No. CA–8600, 1992 WL 12809, 1992 Ohio App. LEXIS 177 (Jan. 13, 1992), the utility company was allowed to remove trees which interfered with its power lines from the easement.

In *Columbia Gas Transmission Corp. v. Bennett,* 71 Ohio App.3d 307, 594 N.E.2d 1 (1990), the Montgomery County Court of Appeals examined a case where the trial court had found that the plaintiff owned a twenty-five foot easement for purposes of

operating a gas transmission line. However, the trial court allowed the property owner to maintain a structure within the easement but not directly above the pipeline. The court of appeals rejected the trial court's interpretation of the parties' rights, stating that

> the trial court abused its discretion by permitting the Bennetts to encroach on the easement. Having found that Columbia Gas required a twenty-five foot easement to maintain its pipeline, the trial court could not, consistent with that finding, permit the Bennetts to build a structure that would clearly interfere with the reasonable and proper enjoyment of the easement.

In the case at bar, the placement of structures such as the Moraveks' storage shed within the easement interferes with Columbia's reasonable and proper enjoyment of its easement. The easement is for the express purpose of maintaining, operating and repairing a gas transmission line. Columbia may only perform those functions in accordance with the Natural Gas Pipeline Safety Act, which completely preempts the field of pipeline safety. Since, as explained above, Columbia is unable to comply with federal law if structures of this nature are erected within the easement, Columbia has the right to maintain the easement free of such interference. Any other interpretation of the easement would render the easement wholly illusory.

## CONCLUSIONS OF LAW

1. 28 U.S.C. § 1332(a) grants subject matter jurisdiction to district courts where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest or costs, and is between citizens of different states.

2. In actions seeking declaratory or injunctive relief, the amount in controversy is measured by the value of the object of the litigation.

3. For the reasons set forth above, Columbia has demonstrated by a preponderance of the evidence that the amount in controversy exceeds the sum or value of $50,000.

4. Since the parties are citizens of different states and the amount in controversy exceeds $50,000, this Court has jurisdiction over the subject matter of this dispute.

5. Under Ohio law, the extent and limitations of an easement are to be ascertained from the language of the grant and from the circumstances surrounding the transaction.

6. The owner of land which is subject to an easement has the right to use the land in any manner not inconsistent with the easement, but has no right to interfere with the reasonable and proper enjoyment of the easement.

7. The Natural Gas Pipeline Safety Act preempts the entire field of pipeline safety.

8. Since a natural gas pipeline may only be operated in accordance with applicable federal laws and regulations, which preempt the entire field of pipeline safety, the granting of an easement for purposes of operating and maintaining a natural gas pipeline necessarily implies the right to operate and maintain that pipeline in accordance with federal law.

9. The owner of an easement has the right to remove objects within the easement which interfere with his reasonable and proper enjoyment of the easement.

10. For the reasons set forth above, Columbia has demonstrated by a preponderance of the evidence that the placement of structures such as the Moraveks' storage shed anywhere within the easement interferes with Columbia's reasonable and proper enjoyment of the easement.

11. Columbia is entitled to remove the Moraveks' shed from within the easement, and is further entitled to an injunction barring the Moraveks and/or Swango from erecting similar structures within the easement in the future.

Wherefore, based upon the above, judgment will be entered in favor of Defendant and Third–Party Plaintiff Columbia Gas Transmission Corporation and against Plaintiff Swango Homes, Inc., and Third–

Party Defendants William and Vernetta Moravek.

Third–Party Defendants are enjoined from maintaining the subject storage shed, or any similar structure, anywhere within the easement. Said storage shed is to be removed within 10 days from receipt of this Order. The shed may remain in its present location during the pendency of any appeal taken from this decision only upon the posting of a supersedeas bond in the amount of $100,000.

The captioned cause is hereby terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.